UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LAURIE W. BOCZAR,** | : | Civil Case Number |
| *Plaintiff*, | : | |
| | : | 3:15-cv-00830 (VLB) |
| v. | : | |
| | : | December 19, 2016 |
| **THE ANTHEM COMPANIES, INC.** | : | |
| *Defendant.* | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 30]

Plaintiff Laurie W. Boczar ("Boczar" or "Plaintiff") brings this employment discrimination action against her former employer, The Anthem Companies, Inc. ("Anthem" or "Defendant"), formerly known as Wellpoint, Inc. Her complaint raises claims for age and gender discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* Plaintiff initially filed this action in Connecticut state court, and the case was removed to this Court on June 1, 2015 pursuant to 28 U.S.C. §§ 1332. Defendant now moves for summary judgment on all claims. For the reasons stated below, the Defendant's Motion for Summary Judgment is GRANTED.

## Facts

The following undisputed facts are drawn primarily from the Defendant's 56(a)1 Statement.[1]

---

[1] The Defendant's Motion for Summary Judgment was filed on April 26, 2016. On June 15, 2016, the Plaintiff had not filed an objection to the Defendant's Motion for Summary Judgment and on that date the Court issued an order for the Plaintiff to show cause why summary judgment should not be granted by filing an objection on or before June 29, 2016, fourteen days after the order and nearly three times the time allotted by the Federal Rules of Civil Procedure to respond to a motion.  On

1

Boczar is a woman who previously worked for Anthem as Web Creative Director.[2] [Dkt. 26, Rule 56(a)(1) Statement of Facts, ¶ 3]. Boczar was hired in March 2009, and at all relevant times, Boczar was over the age of 40 years old when she worked for Anthem. [Dkt. 1, Ex. A, Complaint, ¶ 3; Dkt. 12, Answer, at p. 1; Dkt. 26, ¶ 3]. Boczar's employment was terminated on October 1, 2013, when she was 51 years old. [Dkt. 26, ¶¶ 8, 77.] Anthem is a corporation transacting business in Connecticut with a principal place of business in Indiana. [Dkt. 1, ¶ 2; Dkt. 12, at pp. 1-2]. Anthem provides health benefits as an independent licensee of the Blue Cross and Blue Shield Association to members across the country. [Dkt. 26, ¶ 1].

At Anthem, Boczar was part of the User Design Experience ("UXD") team, which was responsible for the information architecture and visual design associated with Anthem's web and mobile assets. [*Id.* ¶ 10; Dkt. 26, Ex. 4, Tollis Decl. ¶ 3]. She was the highest ranking person on the UXD team with a level of E14

---

the deadline, the Plaintiff's counsel filed a motion for a further fourteen day extension of time citing the fact that he was a solo practitioner, had recently completed an unidentified trial of unidentified duration which took longer than expected and traveled out of state on an unexpected unidentified personal matter. [Dkt. 28, Mot. Ext. Time (June 29, 2016)]. The Court denied the motion finding that the reasons cited did not constitute good cause to grant the Plaintiff three times the period allotted to respond to a motion and because counsel failed to determine there was an objection to his motion, which are both required by the D. Conn. Local Rule 7(b)2. [Dkt. 29, Order Denying Dkt. 28]. The Court has reviewed Plaintiff's 56(a)1 Statement to ensure "that each statement is, in fact, supported by admissible evidence." See *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 5455634, at *1 (D. Conn. Sept. 15, 2015) (observing that the failure to oppose summary judgment does not relieve the Court of its duty of ensuring that the moving party offers admissible evidence in support of its motion).

[2] Boczar is a Connecticut resident and worked in Anthem's Connecticut office. [Dkt. 1, Ex. A, ¶ 1; Dkt. 12, at p. 1].

and therefore would have received a higher salary than any of her peers at a lower level (E13 or below).  [Dkt. 26, ¶ 11].  Giulia Tollis ("Tollis"), Boczar's manager in 2012, stated that she held Boczar to a "higher standard for her performance, gave her additional responsibilities, and expected her to be a thought leader for her peers when it came to creative design and strategy."  [Dkt. 26, Ex. 4, ¶ 4].  One of Boczar's responsibilities was to maintain Anthem's Style Guide, an internal guide used by the Web Design team and other internal groups to make sure the Anthem brand looked and felt consistent in all publications.  [Dkt. 26, ¶ 13].  As Boczar's supervisor, Tollis had concerns regarding her performance, because she struggled to meet deadlines, failed to effectively communicate her deadlines and workload, and spent time on junior tasks as opposed to senior thought leader roles.  [*Id.* ¶ 14].  On October 17, 2012, Tollis provided critical feedback to Boczar and followed-up with an email that same day expressing her disappointment in Boczar's performance.  [*Id.* ¶¶ 15-16].  Specifically, Tollis stated, "As we discussed, I have concerns whether this is the right role for you based on these observations.  You expressed a desire to be focused on more Senior level tasks – icons, style guide, etc.  To do that effectively, it's important that you understand the expectations of your role and that you improve and sustain your performance."  [Dkt. 26, Ex. 5, Email (Oct. 17, 2012), at p. 2].

Despite the critical feedback, Boczar continued to miss deadlines.  On December 6, 2012, Tollis sent Boczar another email documenting her failure to meet status report deadlines from October 3, October 11, October 24, and December 5, as well as her failure to submit any report at all on November 14.  [Dkt.

3

26, Ex. 6]. Tollis concluded, "As we've discussed in the past, I expect that all deadlines are met, unless otherwise discussed and agreed upon in advance of the miss. It's important that you understand the expectations of your role and that you improve and sustain your performance moving forward." [*Id.*] This warning prompted no change in Plaintiff's performance, as she failed to submit another status report, prompting Tollis to remind Boczar on January 10, 2013, that another missing report may result in a written warning. [Dkt. 26, ¶ 23].

In February 2013 Tim Brown ("Brown") was hired to manage the UXD team, reporting to Tollis. [*Id.* ¶ 24]. Boczar's complaint alleges "[w]ithin a very short period from Mr. Brown's hiring, Plaintiff went from a consistently and highly successful employee who was rewarded a[s] such in each of her four years with [Anthem] to an employee who 'consistently fails to meet expectations' with respect to any of Mr. Brown's stated criteria in the PIP."[3] [Dkt. 1, Ex. A, ¶ 18]. Boczar described Brown's management style as "overbearing nitpickiness" and that he was "trying to set [her] up." [Dkt. 26, Ex. 3, Boczar Dep., 36:17, 114:4-5]. In her deposition testimony, the Plaintiff challenges the Defendant's assertion that she missed deadlines, testifying, "I might have had a misspelling, I might have had an overall date on it that, you know, was not the correct date even though he receives it on the correct day." [*Id.* at 114:20-23].

In April 2013 Plaintiff received her 2012 annual performance appraisal. [Dkt. 26, ¶ 26]. Tollis rated Boczar a 3.18 out of 5, an average rating at Anthem, but

---

[3] "PIP" stands for Performance Improvement Plan. Defendant denies Plaintiff's allegation but admits that Plaintiff consistently failed to meet the expectation of Mr. Brown's stated criteria in the PIP. [Dkt. 12, at p. 6].

4

compared to her peers Boczar it was "the lowest rated member of the UXD team." [Dkt. 26, Ex. 4, ¶ 24]. The performance review specifically stated,

- "[A]n area of improvement is more broadly communicating & educating to her peers and interested parties the changes that have been made." [Dkt. 26, Ex. 7, 2012 Performance Coaching, at p. 5].

- "Would like to see Laurie bring more to the table with her designs in rendering visual designs that are more interesting and where she is pushing the bounds of her work." [*Id.* at p. 6].

- "Areas of opportunity for Laurie would be with her verbal communication and presence in meetings. Laurie is of a quiet nature. She tends to be reserved and holds back from responding in meetings. Due to our highly virtual environment, this is perceived as a lack of participation by project teams. Additionally, Laurie needs to become her own voice in the team. I'd like to see Laurie take a more active, vocal role. Communicating her thoughts an opinions to help drive change." [*Id.* at pp. 7-8].

- "Additionally, Laurie will need to work on communicating her workload to leadership and where she stands with projects. At times, it has been difficult to gauge where or what she's really got for deliverables." [*Id.* at p. 10].

Boczar concedes that "there were a couple of things that could have slipped through that were fixed ultimately," and justifies them because "[i]t is human to err." [Dkt. 26, Ex. 3, 77:22-78:7]. As a result of the performance review, Boczar received "one of the lowest AIP rating and bonuses on the team." [Dkt. 26, Ex. 4, ¶ 24].

As a supervisor, Brown conducted 1:1 meetings with UXD team members and continued to require weekly written status reports. [Dkt. 26, Ex. 8, ¶¶ 9-10]. Brown observed errors in her status reports and noticed they were less detailed than those of others. [Dkt. 26, ¶ 37]. Tollis spoke with Brown regarding her concern about Boczar's performance, and Brown came to the same opinion: that she lacked

5

sufficient creative design skills, leadership skills, and transparency in her communication with him.  [*Id.* at ¶ 38].

As a result, on May 21, 2013, Brown placed Boczar on a 60-day PIP.  [*Id.* ¶ 39; Dkt. 26, Ex. 9, PIP].  The PIP reiterated the concerns shared by Tollis and Brown, which had been communicated to Boczar on several occasions.  [*See* Ex. 9]. Nonetheless, Boczar responded in a Memorandum to Human Resources that she was "surprised and taken aback when [she] was given, quite out of the blue," the PIP.  [Dkt. 26, Ex. 10, at p. 1]. Boczar acknowledged that Tollis had informed her of her past performance deficiencies and further acknowledged that she was challenged by the managerial transition and new expectations. [*See id.* at pp. 1-2]. Boczar also stated that some of the standards raised in the PIP "appeared to [her] to be directed towards [her] and on a person-targeted basis and to [her] knowledge are not requirements of [her] peer co-employees."  [*Id.* at p. 2].  These status report standards were, however, required for her peers.  [Dkt. 26, ¶ 43].  Brown met with Plaintiff twice a week after issuing the PIP.  [*Id.* ¶ 47].  Brown communicated to Boczar that there was a "disconnect" on how she perceived her progress with the PIP, but Boczar attributed this to "his point of view" and instead believed things were going "swimmingly."  [Dkt. 26, Ex. 3, 197:14-22].  Halfway through the PIP, Brown provided written feedback, [Dkt. 26, Ex. 11, Interoffice Memorandum] highlighting her continued failure to produce satisfactory work despite some improvements in submitting weekly status reports.  [Dkt. 26, ¶ 51; Ex. 11, at p. 2].

On July 17, 2013, Boczar submitted a response to Brown's written feedback. [Dkt. 26, Ex. 12, Associate Updates].  She stated, "Given the breadth of the level of

style changes I am now making in order to more closely align with your expectations, I am very encouraged by my progress thus far." [*Id.* at p. 5]. Boczar posited that a "60-day timeframe might be a bit ambitious" relative to the material changes requested, and as a result, Brown granted her a 21-day extension the following week. [Dkt. 26, Ex. 13, PIP Extension, at p. 1]. Brown further reiterated details regarding her performance shortcomings in his response. [*See id.*]

On August 14, 2013, Brown documented in an e-mail a 1:1 conversation he had with Boczar regarding her continued unsatisfactory performance. [Dkt. 26, Ex. 14, Boczar Email]. Specifically, he wrote, "I'm concerned because you communicated that you felt things were going well. Therefore, to ensure mutual understanding of the performance deficiencies, I'm summarizing our discussion and the areas that still require improvement." [*Id.* at p. 1]. Prior to this e-mail on August 6, 2013, Boczar produced an incomplete first draft of the Style Guide communication plan, which she had been told was a "priority" at the initial PIP. [Dkt. 26, ¶ 60]. Brown documented her need to improve communication, stating, "As discussed, it is not a bother and is something that I've communicated multiple times as has Giulia that you must keep me informed of your work and provide updates as appropriate." [Dkt. 26, Ex. 14, at p. 2]. Boczar responded, "I appreciate the concern and effort involved in the performance improvement process." [*Id.* at p. 1].

Two weeks later, Boczar was given a final warning through a Corrective Action Form, which notified her that failure to improve could result in employment termination. [Dkt. 26, ¶¶ 65, 67]. The Corrective Action Form granted Boczar 30

days to improve on transparent communication, completing the Style Guide plan, and producing high qualify, error-free work product. [*Id.* ¶ 66].

When Boczar failed to do so, Tollis and Brown consulted with Human Resources and decided to terminate her employment. [*Id.* ¶ 72]. On September 26, 2013, Paul Parente ("Parente"), the Human Resources Director who is also located in Connecticut, informed Boczar in person of her employment termination. [Dkt. 26, ¶ 75; *see* Ex. 2, Parente Decl., ¶ 2]. Boczar was given the option to resign with two-weeks of severance or be terminated for performance, and Parente allowed her to discuss the decision with her husband over the weekend. [Dkt. 26, ¶¶ 75-76]. On October 1, 2013, Boczar decided that she would not resign and as a result her employment was terminated. [*Id.* ¶ 77].

Boczar asserts that a younger man, Andrew Mork ("Mork"), replaced her after her termination. [Dkt. 26, ¶ 78]. She based this belief on the fact that she looked at Mork's LinkedIn page after her termination wherein his position was listed as Creative Director. [*Id.* ¶ 79]. In reality, Mork did not replace Boczar because he instead reported to Tollis; Brown's role was divided in half and he was Brown's peer. [*Id.* ¶ 81]. The second half of Brown's position was eventually filled by Christine Fitzgerald, a 46-year old woman. [*Id.*] Boczar's position was also replaced by a 46-year old woman, Marissa Hereso ("Hereso"), who took on Plaintiff's former daily responsibilities, including the responsibility for the Style Guide. [*Id.* ¶ 82]. Brown recommended Hereso because they previously worked together. [*Id.* ¶ 83].

**Discussion**

**I.     Standard of Review**

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  See *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  Where, as here, "a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied even if no opposing evidentiary matter is presented.'" *Id.* at 244 (emphasis omitted) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal

9

citation omitted). A plaintiff may not rely solely on "the allegations of the pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion for summary judgment are not credible. *Id.* (internal citations omitted). "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of her allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb,* 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).

## II.  Age Discrimination Claim

CFEPA prohibits an employer from discriminating against an employee "because of" her age. Conn. Gen. Stat. § 46a-60(a)(1). Although comprised of state statutory law, the claim is evaluated under the same standard as the Age Discrimination in Employment Act, which applies the burden-shifting framework from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Rubinow v. Boehringer Ingelheim Pharm., Inc.*, 496 F. App'x 117, 118 (2d Cir. 2012) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 96 (2d Cir. 2010)); *Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 313 (D. Conn. 2014) (citing same). The plaintiff bears the initial burden to establish a prima facie case of discrimination, and if this is accomplished the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for its action." *Rubinow,* 496 F. App'x at 118.

At the first step, the plaintiff must produce evidence tending to show: "(1) that she was within the protected age group, (2) that she was qualified for the position,

**(3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."** *Gorzynski*, 596 F.3d at 107 (citation omitted).[4] **Here, it is undisputed that Boczar is over 40 years old (and therefore a member of a protected class) and that she experienced an adverse employment action when her employment was terminated. However, Plaintiff has failed to respond to Defendant's Motion for Summary Judgment or submit her own Motion for Summary Judgment and therefore does not address the other elements of the prima facie case.**

**There is insufficient evidence establishing a prima facie case of age discrimination, even accepting as true the allegations of the Plaintiff's complaint. As Web Creative Director, Boczar was held to a higher standard than her peers with whom she worked, because she ranked at a higher level and would have received a higher pay. [Dkt. 26, ¶ 11]. As early as October 2012, her supervisors began to express their concerns as to whether she understood the expectations of her role and would improve and sustain her performance. [Dkt. 26, Ex. 5, at p. 2]. Notably, Tollis, a woman who supervised Plaintiff before the alleged discrimination**

---

[4] The Court need not determine whether the federal "but for" causation standard applies under *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009), or the "motivating factor test" still applies in CFEPA cases, as Plaintiff's failure to provide any evidence in support of her age discrimination claim makes it clear that she has not met her burden under either standard. The Second Circuit has applied the federal *Gross* "but for" test in CFEPA cases in summary orders. *See, e.g., Rubinow*, 496 F. App'x at 118; *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 22 n.1 (2d Cir. 2011). Although Second Circuit summary orders do not have precedential effect, the district courts cannot "consider itself free to rule differently in similar cases." *Vale v. City of New Haven*, No. 3:11-cv-00632 (CSH), 2016 WL 3944684, at *7 (D. Conn. July 19, 2016) (quoting *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011)). The application of the appropriate test in a CFEPA analysis remains undetermined within this district. *Id.*

occurred, is the person who initiated Plaintiff's critical performance reviews. Boczar stated in her deposition, "I was the oldest in my group. I was singled out with, you know . . . all this paper buildup." [Dkt. 26, Ex. 3, 148:12-15]. However, Plaintiff has provided no concrete examples of situations where she was singled out. The closest Boczar comes to providing such an example is in her Memorandum to Brown regarding the initial PIP, in which she states that standards raised in the PIP "appeared to [her] to be directed towards [her] and on a person-targeted basis and to [her] knowledge are not requirements of [her] peer co-employees." [Dkt. 26, Ex. 10, at p. 2]. This is pure speculation. These weekly status report standards were, however, required by her peers. [Dkt. 26, ¶ 43]. Moreover, Boczar never personally learned about conversations Brown had with other employees and thus can do no more than make what she characterizes as "logical assumptions" of her being singled out. [*See* Dkt. 26, Ex. 3, 67:20-68:13]. Without factual support for her conclusion, the Court is unable to determine that a reasonable jury could reach such a conclusion. Therefore, the Court finds there is insufficient evidence to conclude Plaintiff established a prima facie case for age discrimination.

Notwithstanding Boczar's failure to meet her initial burden, Anthem sufficiently produced a "legitimate, nondiscriminatory reason" as required by the second step for terminating her employment. Anthem provides numerous examples of her supervisors, Tollis and Brown, documenting Boczar's poor performance. [*See, e.g.,* Dkt 26, Exs. 5-7, 9, 11-15]. Evidence shows that Tollis began documenting Boczar's unsatisfactory work product as early as October 17, 2012, [Dkt. 26, ¶¶ 15-

16], and Brown continued to document similar issues after he became Boczar's supervisor in February 2013. [*See, e.g., id.* ¶¶ 24, 37]. Moreover, the Court finds it compelling that Boczar's ultimate replacement was a 46-year old woman only a few years younger than she, noting that such an appointment tends to undermine, and to the extent an inference exists, to rebut the inference of intentional age discrimination. *Inguanzo v. Hous. & Servs., Inc.*, 621 F. App'x 91, 92 (2d Cir. 2015) (noting the plaintiff's replacement of a woman of the same race and gender undermines her race and gender discrimination claims); *Meyer v. State of New York Office of Mental Health*, 174 F. Supp. 3d 673, 688 (E.D.N.Y. 2016) ("Moreover, while also not dispositive, there is an inference against discrimination where the individual hired to replace a plaintiff alleging discrimination is within the same protected class."); *Stouter v. Smithtown Central School Dist.*, 687 F. Supp. 2d 224, 233 (E.D.N.Y. 2010) (granting plaintiff's Title VII disparate treatment gender discrimination claim in part because her replacement was also female); *Nieves v. AvalonBay Communities*, No. 3:06CV00198 (DJS), 2007 WL 2422281, at *11 (D. Conn. Aug. 23, 2007) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination") (citing cases in support). Plaintiff has provided no evidence to rebut this evidence. Plaintiff also has not presented a triable issue of fact to support her claim that she was discriminated against on the basis of her age. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to age discrimination and DISMISSES Plaintiff's age discrimination claim.

### III.  Gender Discrimination Claim

CFEPA also prohibits an employer from discriminating against an employee "because of" her sex, Conn. Gen. Stat. § 46a-60(a)(1).  Like a state age discrimination claim, a state gender discrimination claim proceeds under its federal corollary, which in this circumstance is the Title VII claim analysis.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010).  As such, the *McDonnell Douglas* burden-shifting test also applies to state gender discrimination claims.  *Hoffman v. Schiavone Contracting Corp.*, 630 F. App'x 36, 39 (2d Cir. 2015) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216-17 (2d Cir. 2005)); *Gran v. TD Bank, NA*, No. 3:14-cv-1632 (VAB), 2016 WL 4599895, at *5 (D. Conn. Sept. 2, 2016) (applying *McDonnell Douglas* in a CFEPA gender discrimination case).  The plaintiff must show the following prima facie elements: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for her position; (3) that [s]he suffered an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discriminatory intent."  *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (applying the prima facie test to a gender discrimination claim); *Gran*, 2016 WL 4599895, at *5 (quoting *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 251 (2d Cir. 2014)).

As with Plaintiff's age discrimination case, the absence of any evidence in support of Plaintiff's gender discrimination claim militates in favor of granting summary judgment.  The overwhelming evidence before the Court indicates that Plaintiff was not discriminated on the basis of her gender, but rather her employment was terminated because of poor performance.  Most significantly, in

14

Plaintiff's deposition, she affirmatively acknowledged that she did not believe Brown discriminated against her on the basis of her gender:

> Q: During this time that you worked for Mr. Brown, do you believe that the attitude and meanness he had towards you was driven, at all, by discrimination because of your gender?
>
> A: I would have to say, no. I believe, no.

[Dkt. 26, Ex. 3, 39:21-40:1]. That Tollis, a woman, supervised Boczar and shared the same concerns as Brown, [Dkt. 26, Ex. 8, ¶ 13], that they communicated these concerns in various forms of feedback, and that Anthem replaced her position with another woman, demonstrates that no discriminatory intent existed with respect to gender. For these reasons, the Court finds Plaintiff's gender discrimination case should be DISMISSED.

## IV.    Conclusion

The Court GRANTS Defendant's Motion for Summary Judgment and enters judgment in Defendant's favor. The Clerk is directed to close this case.

IT IS SO ORDERED.

            /s/
        Vanessa L. Bryant
        United States District Judge

Dated at Hartford, Connecticut: December 19, 2016